UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
IN ADMIRALTY
CASE NO. 06-60889-CIV-COHN/SELTZER

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

    Plaintiff/Counter-Defendant,

vs.

LAGO CANYON, INC.

    Defendant/Counter-Plaintiff

_____/

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**THIS CAUSE** is before the Court upon Defendant's Renewed Motion Following Remand for Partial Summary Judgment as to Coverage [DE 344] ("Motion") and Plaintiff's Cross-Motion for Summary Judgment [DE 353] ("Cross-Motion"). The Court has carefully considered the Motion, the Cross-Motion, all of the parties' submissions, argument of counsel on December 9, 2009, and is otherwise fully advised in the premises.

I. BACKGROUND

Defendant Lago Canyon, Inc. ("Lago") owns a yacht that partially sank at a dock while undergoing engine repairs ("the Vessel"), causing over $1.2 million in damages ("the Loss"). Plaintiff St. Paul Fire and Marine Insurance Company filed a complaint for a declaratory judgment to determine coverage under a marine insurance policy it had issued to Lago ("the Policy"). Lago counterclaimed for breach of the Policy.

The property damage coverage section of the Policy provides that Plaintiff "will

pay for accidental direct physical loss of or damage to [the] yacht except as specifically stated or excluded in this policy." DE 1 at 12.[1]  The parties agree that "accidental" loss or damage to the yacht covers fortuitous loss unless subject to an exclusion.  The coverage paragraph also states that if the loss is caused by a "provable manufacturer's defect," no deductible will apply.  Before trial, on motion for summary judgment, this Court concluded that the Policy indicates that a loss must be fortuitous to be covered and that a "manufacturer's defect" is an example of a covered, fortuitous loss where no deductible applies.

Thereafter, the Court held a three-day bench trial and found the following: (1) the proximate cause of the damage was the failure of a brass hose barb[2] which resulted from corrosion, (2) the Policy specifically excluded corrosion, and (3) a provable manufacturer's defect was not shown.  The Court, however, did find that the manufacturer's use of yellow brass for the hose barb, knowing its exposure to saltwater,

---

[1] The complete property damage coverage section of the Policy provides as follows:

> **Coverage Provided:** We will pay for accidental direct physical loss or damage to your yacht *except as specifically stated or excluded in the policy*.  The amount of Property Damage Coverage for your yacht is shown on the Declarations Page.  The Deductible Amount shown on the Declarations Page applies to each occurrence unless a more specific deductible for that particular property applies.  If the loss or damage is caused by a provable manufacturer's defect, caused by fire not originating from your yacht, or results from a collision caused by another vessel, no deductible will apply.

DE 1 at 12.

[2] Throughout this order, the terms "hose barb" and "hose bib" are used interchangeably.

created a condition likely to cause corrosion.  This was considered by the Court as a design defect as opposed to a manufacturer's defect.  The Court found that the manufacturer's use of yellow brass for the hose barb was not covered by the term "manufacturer's defect" in the Policy.

Lago appealed this Court's judgment.  The Eleventh Circuit found that this Court erred when it concluded that a design defect was not a manufacturer's design defect.  The Eleventh Circuit concluded that the phrase "manufacturer's defect" as used in the Policy includes "defects attributable to the manufacturer whether in the manufacturer's design or manufacturing of the product."  DE 301 at 18.  Because this Court did not construe the policy to cover loss attributable to the manufacturer's design defect, this Court did not determine whether "the use of yellow brass rose to the level of a manufacturer's design defect and, if so, what impact this had on the multiple causation issues in the case and the court's other fact findings."  Id. at 19.

The Eleventh Circuit vacated this Court's judgment in favor of St. Paul and remanded the case to this Court "for further bench trial proceedings as to the alleged 'manufacturer's defect' and prejudgment interest issues."  Id. at 21.  Defendant has moved for partial summary judgment on the manufacturer's defect issue.  In its response, Plaintiff also moved for summary judgment.

## II. DISCUSSION

### A. Legal Standards

The Court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."

3

Fed. R. Civ. P. 56(c).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  According to the plain language of Fed. R. Civ. P. 56(e), the non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

### B. Coverage

The Court must first determine whether the Policy provides coverage for the

Loss.  As noted above, the Policy provides coverage as follows:

> **Coverage Provided:** We will pay for accidental direct physical loss or damage to your yacht *except as specifically stated or excluded in the policy*.  The amount of Property Damage Coverage for your yacht is shown on the Declarations Page.  The Deductible Amount shown on the Declarations Page applies to each occurrence unless a more specific deductible for that particular property applies.  If the loss or damage is caused by a provable manufacturer's defect, caused by fire not originating from your yacht, or results from a collision caused by another vessel, no deductible will apply.

DE 1 at 12 (emphasis added) ("Coverage Provision").  The first sentence of the Coverage Provision explains that the Policy covers accidental direct physical loss or damage unless such loss is specifically excluded in the Policy.  The next three sentences of the Coverage Provision do not create or provide coverage.  Rather, those sentences address how much coverage is available to the insured, the amount of the insured's deductible and whether the deductible applies to the loss.

Thus, unless the Policy specifically excluded the cause of the Loss, coverage exists.  The portion of the Policy pertaining to exclusions provides as follows:

> **Exclusions:** We will not provide Property Damage Coverage for any loss or damage caused by or resulting from wear and tear, electrolysis, lack of maintenance, corrosion, deterioration, mold, or fiberglass blisterning.  We will not provide coverage for any loss or damage to the provisions of your yacht, including alcoholic beverages.

DE 1 at 13.  If Plaintiff proves that wear and tear, electrolysis, lack of maintenance, corrosion, deterioration, mold, or fiberglass blistering was the cause of the Loss, then no coverage exists. See State Farm Mut. Auto Ins. Agency v. Pridgen, 498 So. 2d 1245, 1247-48 (Fla. 1986) (finding the burden is on the insurer to prove a loss was caused by an exclusion to the policy).

Defendant contends the cause of the Loss was a manufacturer's defect – a

5

cause of loss not excluded by the Policy.  Plaintiff, on the other hand, contends the cause of the Loss was corrosion – a cause of loss explicitly excluded by the Policy.

### 1. The Use of a Yellow Brass Hose Barb Constitutes a Manufactuer's Defect

Plaintiff issued the Policy to insure the Vessel.  As the Court found at trial, and the Eleventh Circuit affirmed, the Policy provides coverage for losses caused by a manufacturer's defect.  Defendant contends that "[t]he undisputed evidence of record establishes that the loss was in fact caused by a 'provable manufacturer's defect,' and the Court should therefore find coverage for the loss exists under the policy as a matter of law."  Motion at 2.

In support of its contention, Defendant states the following facts: 1) "A failed hose barb was the source of water intrusion;" 2) "The Vessel partially sank as a result of the water intrusion caused by the failure of the hose barb;" 3) "The failed hose barb was an original part of the Vessel installed by the manufacturer;" and 4) "The failed hose barb was made of 'yellow brass.'"  Id. at 2-3.  Furthermore, Defendant asserts as an undisputed fact that "[t]he owner of a vessel can do nothing to prevent the dezincification of uninhibted yellow brass" and that "[t]he Owner's Manual for the Vessel does not warn of the risks of dezincification in the air conditioning system, nor are there any maintenance recommendations from the manufacturer which address this issue."  Id. at 3.  Defendant also maintains that "Stewart Hutcheson, a marine surveyor who was produced by St. Paul as one of two of its corporate representatives on the issue of causation, concluded in his April 2, 2006 report to St. Paul, that the loss 'was caused by a defectively designed and installed plumbing fixture.'"  Id. at 4 (citations omitted).  "Hutcheson further concluded that the failed fitting was 'not of marine grade.'"  Id.

6

Similarly, "David Wills, P.E., St. Paul's other Rule 30(b)(6) designee on the issue of causation, stated: 'The copper alloy, commonly known as yellow brass, used to manufacture the hose bibs present in the air condition piping assembly is not recommended for seawater service,' citing the ASM Metals Handbook." Id. at 4-5 (citations omitted).

Plaintiff does not contest any of those facts. See DE 353 at 1 (adopting the quoted statement of facts as its own). Rather, Plaintiff makes the following five arguments in opposition to the Defendant's Motion and in support of its own Cross-Motion: 1) the hose bib lasted at least as long as its "reasonably expected life service;" 2) any problems with the hose bib "could have and should have been detected through customary and ordinary inspection, as required by the standards of prudent seamanship[;]" 3) Florida's consumers products liability law suggests that the use of a yellow brass hose bib did not constitute a design defect; 4) "Yellow Brass Components are Widely-Used in Marine Salt Water Cooling Systems[;]" 5) "The Defendant's Position that the Loss is Attributable to the Inevitable Process of Dezincification, if Accepted, Precludes Recovery Under the Policy[;]" and 6) "Even if the use of Yellow Brass was a Manufacturer's Defect there is no Coverage for the Loss under the Policy of Insurance." Cross-Motion at 5-17. The Court will address each of these arguments in turn.

### a. Reasonable Expected Life Service

Plaintiff asserts that a hose bib made of yellow brass would be expected to last about five years. DE 353 at 3. Plaintiff further points out that the hose bib on the Vessel lasted almost seven years. Id. at 3. Thus, Plaintiff argues, the hose bib "lasted

7

as long as intended - there was no 'defect' in its design."[3]  Cross-Motion at 8.  Plaintiff has missed the point.

Defendant does not contend that the hose bib contained a design defect.  Rather, Defendant necessarily argues that *the Vessel* contained a design defect.  It is irrelevant if a yellow brass hose bib lasted as long as intended because the actual subject of the Policy – the Vessel – did not last as long as intended.[4]  The Vessel did not last as long as intended because the designer/manufacturer of the Vessel elected to use a yellow brass hose bib even though both parties recognize that "other metals would have given a longer service time."  Id. at 7.

Plaintiff points out that "Mr. Grate testified that from a metalurigical perspective there are a number of other metals readily available for use in manufacturing the hose bib which, if used, would have been expected to provide a longer service life in the same environment because they would not have been subject to dezincification."  Cross-Motion at 5.  Plaintiff responds that "[a] hose bib made from any one of these metals eventually will corrode and deteriorate in a salt water environment and ultimately require replacement."  Id. at 6.

The Court recognizes that all materials eventually break down.  A manufacturer need not use the best or most expensive components in its products to avoid a finding of a "manufacturer's defect" in its product(s).  Rather, a manufacturer need only use a

---

[3] To support its argument, Plaintiff asserts that "[i]f a product functions as intended for the length of time reasonably expected by the manufacturer, it cannot be considered defective merely because other products last longer."  DE 353 at 4.

[4] Plaintiff asserts that "[a]ccording to Dr. Fisher, the life expectancy of a '74 Sunseeker 'should be something well in excess of twenty years.'"  353 at 4.

component that is reasonable when considering a variety of factors including, but not limited to, cost and the expected life of the product.  Here, the evidence indicates that the cost of a more durable hose barb would be negligible and that the hose barb could not be expected to last even a third as long as the expected life of the product.

Moreover, the Court recognizes that not all components of all products are intended to last as long as the product itself (e.g., the tires or window wipers on an automobile).  In such instances, however, the manufacturer typically advises the owner, through an owner's manual or otherwise, that such parts require periodic replacement.  Here, as demonstrated above, the evidence shows the manufacturer never advised the owner of the Vessel that the yellow brass hose bib required periodic maintenance or replacement.

Stated differently, a manufacturer's decision to use a component with an expected service life far shorter than the expected service life of the product that incorporates that component, coupled with the manufacturer's failure to inform the owner of the product that the component requires maintenance and/or replacement long before the expected service life of the product expires,[5] constitutes a manufacturer's defect.[6]

---

[5]  Plaintiff argues "[i]n Dr. Fisher's view, unless the manufacturer clearly identifies an individual metal piece as susceptible to a shorter service life, then there is no reason to suspect it will not last the life of the vessel." Cross-Motion at 8.  Plaintiff than calls this conclusion "startling." Id.  The Court does not find this conclusion remotely startling.  Indeed, the Court finds Dr. Fisher's conclusion to be perfectly reasonable.

[6]  Although the question would become closer – and might require a different conclusion – if the component part that caused the product's failure lasted nearly as long as the expected life of the product, the facts here do not require the

9

b. Customary or Ordinary Inspection

Plaintiff contends that "any problems associated with the hose bib could have and should have been detected through customary and ordinary inspection, as required by the standards of prudent seamanship." Cross-Motion at 3. Even if true, Plaintiff's contention is irrelevant.

The detection of a defective component obviously does not render the component any less defective.[7] Thus, Plaintiff must be arguing either that Defendant's failure to detect the component is an affirmative defense that reduces Plaintiff's potential liability or that Defendant's failure to identify the manufacturer's defect was the proximate cause of the Loss. As discussed above, the Eleventh Circuit remanded this case so that this Court could resolve the narrow manufacturer's defect issue and its interplay with the corrosion exclusion. Were the Court to decide whether inspection would have revealed the alleged defect, the Court's ruling would be in derogation of the doctrine of the law of the case. See section II.B.1.e, infra. Thus, the Court will not address this portion of Plaintiff's argument.[8]

c. Florida's Consumer Products Liability Law Does Not Apply Here

Plaintiff asserts that "the Eleventh Circuit's opinion confirms the paucity of

---

Court to make a close call.

[7] If the manufacturer/designer of the Vessel elected to use a hose bib made out of sugar, but the owner of the Vessel detected the sugar hose bib before it melted, would the design/manufacture of the Vessel contain a defect? If a yacht sinks in the ocean and no one is there to see it, does it still sink? The Court finds the answer to these profound questions is "yes."

[8] Regardless, as demonstrated below, the Court does not find that the failure to identify the manufacturer's defect was the proximate cause of the Loss.

10

relevant precedent in the general maritime law on the interpretation of 'manufacturer's defect' and, by implication, of 'design defect,' within a policy of marine insurance." Cross-Motion at 6. "The Court," Plaintiff continues, "must therefore turn to Florida law for guidance." Id. Plaintiff then maintains that "[t]he obvious analogy lies within Florida's consumer products liability law." The Court disagrees.

Products liability sounds in tort, but this action is based on a contract. Indeed, as Plaintiff itself points out, "[t]he interpretation of the provisions of an insurance *contract* is a matter of law to be decided by the court." Id. at 12 (emphasis added). Consequently, the Court finds it more appropriate to apply principles of contract law, rather than principals of tort law, in the instant action.

In Dahl-Eimers v. Mutual of Omaha Life Insurance Co., the court set forth several rules of construction developed under Florida law for interpreting insurance contracts. See 986 F.2d 1379, 1381-82 (11th Cir.1993). The first of those rules requires a court to "assess the natural or plain meaning of the policy language." Id. at 1381. Here, the issue before the Court hinges upon the meaning of the words "manufacturer" and "defect" in the Policy.

The American Heritage Dictionary defines "manufacturer" as follows: "A person, enterprise, or entity that manufactures, esp. the owner or operator of a factory."[9] Similarly, the American Heritage Dictionary defines "defect" as follows: "1. The lack of

---

[9] The American Heritage Dictionary contains the following definition for "manufacture": "1. a. To make or process (a raw material) into a finished product, esp. by means of a large-scale industrial operation. b. To make or process (a product), esp. with the use of industrial machings. 2. To create produce, or turn out in a mechanical manner. 3. To concoct or invent; fabricate."

11

something necessary or desirable for completion or perfection; deficiency; 2. An imperfection; fault." American Heritage Dictionary (2d College Ed. 1985).

Under the facts of this case, the Court finds that use of a yellow brass hose barb in the Vessel was an imperfection and a fault.  Accordingly, using the natural, plain meaning of the words "manufacturer" and "defect," the Court finds that the use of a yellow brass hose barb was a manufacturer's defect.

### d. Wide Use of Yellow Brass

Plaintiff points to evidence that "yellow brass is used in a variety of salt water plumbing systems aboard yachts" and that "the use of yellow brass components is safe and effective, provided that they are inspected and maintained."  Cross-Motion at 10. Even if use of yellow brass is commonplace onboard yachts, which the Court does not decide, the use may still constitute a manufacturer's defect.  As discussed above, if a component will inevitably fail long before the reasonable expected life of the Vessel and the manufacturer does not inform the owner of such inevitable failure, the use of such a component may constitute a manufacturer's defect.  See section II.B.1.a, supra. Plaintiff's argument that the use of yellow brass is not a manufacturer's defect because it is common is unpersuasive.

### e. Inevitable Dezincification of Hose Barb Does Not Preclude Coverage

Plaintiff contends that "the position taken by [Defendant] in its Motion, if accepted by the Court, establishes that the [Vessel] was in an unseaworthy condition at the commencement of the Policy term.  Accordingly, under well-entrenched principles of maritime law governing the interpretation of marine insurance contracts, the Policy is void *ab initio*."  Cross-Motion at 12.  Essentially, Plaintiff argues that if the Vessel would

inevitably fail due to dezincification of the hose barb, the Vessel was not seaworthy when Plaintiff issued the Policy. Even if the Court accepted Plaintiff's logic – which it does not[10] – the Court cannot find for Plaintiff on this argument.

The doctrine of the "law of the case" provides that a ruling from a federal court "not only establishes a precedent for subsequent cases under the doctrine of *stare decisis*," but also establishes "the law which . . . it itself will, normally, apply to the same issues in subsequent proceedings in the same case." Morrow v. Dillard, 580 F.2d 1284, 1289 (5th Cir. 1978) (internal quotation omitted). The doctrine is "'based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter.'" Id. (quoting United States v. U.S. Smelting Refining & Mining Co., 339 U.S. 186, 198 (1950)). Stated differently, the law of the case requires that once an issue has been decided at one stage of a case, that decision is binding at later stages of the same case. United States v. Escobar-Urrego, 110 F.3d 1556 (11th Cir. 1997).

Here, the Court already determined that the Policy provides coverage for manufacturer's defects.[11] The Eleventh Circuit affirmed that determination. Indeed, the Eleventh Circuit remanded this case "for further bench trial proceedings consistent with this Court's ruling [only] as to the 'manufacturer's defect' issue." DE 301. Thus, the Court may not address additional issues without finding its ruling in derogation of the law of the case. See Parker v. Scrap Metal Processors, Inc., 468 F.3d 733, 741 (11th Cir. 2006). In other words, that ship has sailed.

---

[10]   Suggesting a vessel will inevitably become unseaworthy is not the same as suggesting it *is* unseaworthy as soon as it is built.

[11]   Provided, of course, that no exclusion applies.

### 2. Even Though the Use of a Yellow Brass Hose Barb Constitutes a Manufacturer's Defect, the Proximate Cause of the Loss Was Corrosion, a Cause of Loss Excluded Under the Policy

To determine whether the loss is covered under the Policy, the Court applies the doctrine of proximate cause. Standard Oil Co. v. United States, 340 U.S. 54, 57-58 (1950); Lanasa Fruit S.S. & Importing Co. v. Universal Ins. Co., 302 U.S. 556, 562 (1938); Tillery v. Hull & Co., 876 F.2d 1517 (11th Cir. 1989). Proximate cause "does not necessarily refer to the cause nearest in point of time to the loss." Standard Oil Co., 340 U.S. at 58. Rather, "it refers to the cause which is most nearly and essentially connected with the loss as its efficient cause." Id. The cause must be the "predominate and determining" cause of the loss. Id. Thus, if the proximate cause of the Loss is listed within the Policy's exclusions, no coverage exists.

On May 6, 2008, the Court entered its Findings of Fact and Conclusions of Law [DE 269] ("Findings"). In its Findings, the Court determined the following: 1) A failed hose barb was the source of the water intrusion into the Vessel; 2) The hose barb fractured as a result of corrosion;[12] 3) Corrosion is specifically listed as an exclusion to coverage; and 4) The proximate cause of the loss was the failure of the hose barb which resulted from corrosion. Findings at 4, 7.

---

[12] Defendant contends that the hose barb failed as a result of dezincification which is a specific type of corrosion not contemplated by the corrosion exclusion in the Policy. The Policy, however, excludes "corrosion." The Policy does not define "corrosion." The Court, therefore, gives corrosion its plain meaning. See Dahl-Elmers v. Mutual of Omaha Life Ins. Co., 986 F.2d 1379, 1381-82 (11th Cir. 1993); State Farm Fire & Cas. Co. v. Met. Dade County, 639 So. 2d 63, 65 (Fla. Dist. Ct. App. 1994). Thus, the Court interprets "corrosion" to encompass any and all types of corrosion. Stated differently, the Court declines to read into the Policy a meaning of corrosion that encompasses some forms of corrosion and excludes others.

The Eleventh Circuit did not disturb any of those findings.  Accordingly, such findings constitute the law of the case.  Furthermore, the parties have submitted no new evidence that cast doubt on those findings.  The Court, therefore, concludes once again that the proximate cause of the loss was the failure of the hose barb which resulted from corrosion.  Because the proximate cause of the Loss was corrosion, and corrosion is a cause of loss excluded under the Policy, no coverage exists for the loss of the Vessel.

### III. CONCLUSION

In light of the foregoing, it is **ORDERED AND ADJUDGED** that Defendant's Renewed Motion Following Remand for Partial Summary Judgment as to Coverage [DE 344] is **DENIED**.  Plaintiff's Cross-Motion for Summary Judgment [DE 353] is **GRANTED**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 9th day of December, 2009.

*/s/ James I. Cohn*
JAMES I. COHN
United States District Judge

Copies provided to counsel of record.